**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **WILLIAM MIGNIN, III, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,** | |
| **Plaintiff,** | **Case No.:** |
| **v.** | **Judge:** |
| **MARS, INC.,** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

## CLASS ACTION COMPLAINT

Plaintiff William Mignin, III ("Plaintiff" or "Mr. Mignin") brings this action on behalf of himself, and all others similarly situated against Mars, Inc. ("Defendant" or "Mars"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff brings this class action lawsuit on behalf of himself and similarly situated consumers ("Class Members") who purchased for personal, family, or household consumption, Defendant's candies sold under the brand name "Skittles®" (the "Products"),[1] which are unfit for human consumption because they contain titanium dioxide ("TiO2"), a known toxin. Defendant has long known of the health problems posed by TiO2. In fact, in February 2016, Defendant

---

[1] This includes Skittles® Original, Skittles® Wild Berry, Sour Skittles®, Tropical Skittles®, and Smoothies Skittles®, among others.

1

publicly committed to phasing out TiO2. Defendant has flouted its own promise to consumers. More than six years later, Defendant continues to sell the Products with TiO2.

2.      Interestingly, in its February 2016 press release, Defendant indicated that its planned phase out of TiO2 was called for simply because "consumers today are calling on food manufacturers to use more natural ingredients in their products." Incredibly, Defendant even claimed that "[a]rtificial colors pose no known risks to human health or safety." In doing so, Defendant concealed from consumers material information it knew. Namely, that numerous of its competitors and other food manufacturers had long removed the toxin from their product lines because of scientific research showing that the toxin is unsafe for consumption.

3.      Several nations have banned the harmful toxin, TiO2. For example, in 2019, TiO2 was banned in France, where Defendant maintains offices and announced that it could and would comply with France's law requiring TiO2 no longer be allowed in food products.

4.      In May 2021, the European Food Safety Authority ("EFSA") released its report on the health concerns associated with TiO2, determining that TiO2 could not be considered safe for consumption. Professor Maged Younes, Chair of EFSA's expert Panel on Food Additives and Flavourings ("FAF") underscored these findings, stating that: "Taking into account all available scientific studies and data, the Panel concluded that titanium dioxide can no longer be considered safe as a food additive. A critical element in reaching this conclusion is that we could not exclude genotoxicity concerns after consumption of titanium dioxide particles."[2]

5.      Building on EFSA's research, the European Commission ("EC") announced that it too would adopt a ban on the use of TiO2 as a food additive. Under that plan, the ban would apply

---

[2] EFSA, "Titanium dioxide: E171 no longer considered safe when used as a food additive," (May 6, 2021) https://www.efsa.europa.eu/en/news/titanium-dioxide-e171-no-longer-considered-safe-when-used-food-additive.

2

following a six-month transition period, and beginning summer 2022, the additive should no longer be added to food products. That plan was adopted unanimously by Member States.

6. Defendant – with offices in Netherland, Denmark, Ireland, Italy, Portugal, Germany, Norway, Czech Republic, Romania, Belgium, Switzerland, Austria, Slovakia, Hungary, France, Greece, and Spain[3] - and with sales in each of those Member States was reminded of the scientific findings concerning TiO2 and was required to comply with the EC's ban.

7. Nonetheless, in the United States, Defendant maintains sales with TiO2 as an additive, failing to inform consumers of the implications of consuming the toxin. Instead, Defendant relies on the ingredient list which is provided in minuscule print on the back of the Products, the reading of which is made even more challenging by the lack of contrast in color between the font and packaging, as set out below in a way consumers would normally view the product in a store.



---

[3] MARS, "Our Locations," https://cze.mars.com/en/locations?language_content_entity=en.

8.     Consequently, consumers who purchase Defendant's Products are at heightened risk of a host of health effects for which they were unaware stemming from genotoxicity – the ability of a chemical substance to change DNA.

9.     Based on Defendant's omissions, a reasonable consumer would expect that the Products can be safely purchased and consumed as marketed and sold. However, the Products are not safe and pose a significant health risk to unsuspecting consumers. Yet, neither before nor at the time of purchase does Defendant notify consumers like Plaintiff that the Products are unsafe to consumers, contain heightened levels of titanium dioxide, and should otherwise be approached with caution.

10.    Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a class of all others similarly situated for (1) violation of the Uniform Deceptive Trade Practices Act, 815 ILCS 510, *et seq*.; (2) violation of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505, *et seq*.; (3) Fraud; (4) Fraudulent Inducement; (5) Fraudulent Omission or Concealment; (6) Quasi-Contract/Unjust Enrichment; and (7) Breaches of Express Warranty, Implied Warranty of Merchantability/Fitness for a Particular Purpose and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

## PARTIES

11.    Plaintiff William Mignin, III is a natural person and citizen of Illinois who resides in Batavia, Illinois. Mr. Mignin regularly purchases Defendant's Products. Mr. Mignin's most recent purchase of the Products was on or around July 21, 2022, when he purchased Sour Skittles® from a brick-and-mortar 7-Eleven located at 336 E. Wilson Street, Batavia, Illinois. Prior to his purchase, Mr. Mignin reviewed the labeling, packaging, and marketing materials of the Products and saw the false and misleading claims that, among other things, the Products are safe for human

4

consumption. Mr. Mignin understood these claims to be representations and warranties by Mars, Inc., that the Products are free from all traces of harmful ingredients. Mr. Mignin reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that he would not have purchased the Products or would not have purchased them on the same terms if the true facts about its contents had been known. As a direct result of Mars, Inc.'s material misrepresentations and omissions, Mr. Mignin suffered, and continues to suffer, economic injuries.

12.     Mr. Mignin remains interested in purchasing candies from Defendant that are safe for consumption. However, Plaintiff is unable to determine if the Products are actually safe for consumption. Plaintiff understands that the composition of the Products may change over time. But as long as Defendant may market the Products as safe for consumption when the Products are not safe for consumption, then when presented with false or misleading information when shopping, he will be unable to make informed decisions about whether to purchase Defendant's Products and will be unable to evaluate the different prices between Defendant's Products and competitor's Products. Plaintiff is further likely to repeatedly be misled by Defendant's conduct, unless and until Defendant is compelled to ensure that Products marketed and labeled as safe for consumption are, in fact, safe for consumption.

13.     Defendant Mars, Inc. is a foreign corporation with its domestic headquarters located at 9885 Elm Street, McLean, Virginia 22101. Defendant Mars, Inc. operates four business segments: Mars Wrigley Confectionary, Petcare, Food, and MARS Edge.[4] The business segment relevant to Plaintiff's claims herein, is Mars Wrigley Confectionary ("Mars Wrigley"), which manufactures, packages, and distributes its candy products. In 2016, Mars Chocolate and Wrigley

---

[4] https://web.archive.org/web/20130326103541/http://www.mars.com/global/brands.aspx

were merged to create a new subsidiary of the company – Mars Wrigley.[5] Relevant to Plaintiff's claims herein, Mars is a leading manufacturer, packager, and distributor of, among other products, candy and confectionery. Mars Wrigley maintains its global headquarters in Chicago, Illinois, and its US headquarters in New Jersey.[6]

14.     Mars has done business throughout Illinois and the United States at all times during the Class Period. At all relevant times, Mars, Inc., has advertised, marketed, manufactured, distributed, and/or sold candy and confectionery, including the Products at issue, to consumers in and throughout Illinois and the United States. At all relevant times, Mars, Inc. formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.

15.     Plaintiff reserves the right to amend this Complaint and add different products and additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, and/or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper in this Court because Plaintiff is a citizen of Illinois and Defendant purposefully availed itself of the laws, protections, and advantages of Illinois by conducting business in this State, maintaining its global headquarters in this State, and by conducting business within every County in this State, with consumers like Plaintiff.

17.     Venue is proper in this Court pursuant to 735 ILCS 5/2-101 because the transactions or some part thereof out of which this cause of action arose occurred in this County.

---

[5] https://www.mars.com/news-and-stories/press-releases/hackettstown-us-base
[6] *Id*.

## FACTUAL ALLEGATIONS

### A.    Mars' Candy Skittles®

18.    Skittles® candy is manufactured, marketed, and sold by Mars Wrigley. The candy is well-known by its colorful array, which Mars has dubbed "the rainbow" for marketing purposes to great success. For example, Skittles® was "America's favorite non-chocolate chewy candy in 2017, with sales in excess of $185 million U.S. dollars."[7]

19.    The color of Defendant's rainbow, however, is due to its use of TiO2.

20.    Significantly, Defendant need not rely on the use of TiO2 to achieve this result.

21.    Numerous of Defendant's competitors do not use TiO2 in their products and yet are able to maintain the colorful impression Defendant hopes to achieve with its Products.

22.    For example, Swedish Fish Soft & Chewy Candy does not rely on TiO2 and yet achieves a bright red color.

23.    Likewise, Black Forest Gummy Bears does not rely on TiO2 and still strikes an assortment of colors, including orange, red, yellow, and green.

24.    Similarly, Sour Patch Kids does not make use of TiO2 and accomplishes vivid colors like lime green, yellow, orange, and redberry.

25.    Nerds also achieves bright colors including blue, green, red, and orange without the use of TiO2.

26.    Indeed, even Defendant has colorful confectionary goods such as its M&Ms product line that does not rely on TiO2.

---

[7] Nils-Gerrit Wunsch, *Sales of Leading Non-Chocolate Chewy Candy Brands of the United States in 2017,* STATISTA (Nov. 25, 2020) https://www.statista.com/statistics/190409/top-non-chocolate-chewy-candy-brands-in-the-united-states/ (last visited July 21, 2022).

B.      **Titanium Dioxide is Harmful to Human Health**

26.      In February 2016, Defendant alerted the public of its intention to remove TiO2 from its confectionary products.

27.      Following that announcement, Jaydee Hanson, Senior Policy Analyst at the Center for Food Safety, stated that "We are pleased to see that MARS has taken a positive step toward eliminating toxic, unnecessary nanomaterials from its line of food products. We urge the company to speed up the removal of these additives, especially given the grave health concerns associated with titanium dioxide and other nanoparticles."

28.      Mr. Hanson further stated that "Studies have shown that the human health risks associated with ingesting nanoparticles of many common food additives far outweigh any utility for producers. There are plenty of non-toxic alternatives available and we urge MARS and others to commit to not using any engineered nanomaterials in human and animal food products."

29.      Defendant's public statements built on efforts by other large food companies to remove TiO2 from their products. In March 2015, for example, Dunkin Donuts announced that it would no longer use TiO2.

30.      The reason for eliminating titanium dioxide is simple: TiO2 – which is used in paints, coatings, adhesives, plastics, printing inks, and roofing materials – has demonstrated an ability to pass through biological membranes, circulate through the body, and enter cells. Research shows that the effects are serious, including DNA and chromosomal damage, organ damage, inflammation, brain damage, genital malformations, lesions in the liver and kidneys, and cell neurosis.

31.      Titanium dioxide also builds up in the body's intestinal tract. Ordinarily, the intestinal tract serves to absorb nutrients for the body. However, titanium dioxide cannot be

absorbed. When this occurs, the body's M-Cells absorb these particles and bring them to the innate immune system. Over time, the titanium dioxide particles are incorporated by the innate immune system cells where they will remain without being degraded or dissolved.

32.     In 2019, the French government responded to these troubling findings by banning all foods containing titanium dioxide. This ban took effect in January 2020.

33.     At that time, one of Defendant's subsidiaries, Mars Wrigley Confectionary France, confirmed that it could and would comply with the law.

34.     Later that year, in October 2020, the European Parliament removed titanium dioxide from the list of food additives authorized by the European Union for human consumption. European researchers studying titanium dioxide noted that the long half-lives of titanium dioxide nanoparticles created the potential for the particles to accumulate inside human organs and tissue. European researchers also determined that titanium dioxide nanoparticles could cause DNA strands to break, leading to chromosomal damage.

### C.     Defendant's Omissions Concerning TiO2 is Actionable

35.     Despite its February 2016 commitment to U.S. consumers and its apparent compliance with the laws of the European Commission, Defendant has endangered U.S. consumers, exposing them to TiO2, which Defendant knows carries significant health concerns. It also failed to tell consumers that contrary to its earlier representations, it did not remove TiO2.

36.     As a result, Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as safe for human consumption when they are not in fact safe for human consumption.

37.     Plaintiff and Class Members bargained for products that are safe for human consumption and were deprived of the basis of their bargain when Defendant sold them Products containing dangerous substances with serious health consequences.

38.     No reasonable consumer would expect that the Products marketed as safe for human consumption would pose a risk to their health, safety, and well-being, or that it would contain TiO2, which is linked to harmful health effects in humans. Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Products.

39.     As the Products expose consumers to a substance that poses a risk to consumers' health, the Products are not fit for human consumption. Plaintiff and the Class are further entitled to damages for the injury sustained in being exposed to TiO2, damages related to Defendant's conduct, and injunctive relief.

40.     Moreover, because these facts relate to a critical safety-related deficiency in the Products, Defendant was under a continuous duty to disclose to Plaintiff and Class Members the true standard, quality, and grade of the Products and to disclose that the Products contained substances known to have adverse health effects. Nonetheless, Defendant concealed and misrepresented this information, as discussed herein.

41.     Although Defendant is in the best position to know what content it placed on its packaging during the relevant timeframe, and the knowledge that Defendant had regarding the presence of TiO2, and its failure to warn consumers that the Products contained TiO2, to the extent necessary, Plaintiff alleges the following facts with particularity:

42.     **WHO:** Defendant made material omissions of fact about the Products through its labeling, which shows that the Products are safe for human consumption. These representations constitute omitted material information regarding harmful chemicals.

43. **WHAT:** Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contain a substance – TiO2 – that is widely known to have significant health repercussions, has been completely banned for purposes of human consumption in other countries and is not fit for human consumption. Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products are safe for human consumption when they are not and fail to disclose the amount of TiO2 in the Products. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet they continued to pervasively market the Products in this manner in the U.S. market.

44. **WHEN:** Defendant made material omissions during the putative class periods, including prior to and at the time Plaintiff and Class Members purchased the Products, despite its knowledge that the Products' contained TiO2, a harmful substance with known adverse health effects.

45. **WHERE:** Defendant's marketing message was uniform and pervasive, carried through material omissions on the labeling of the Products' packaging, website, and through marketing materials.

46. **HOW:** Defendant made material omissions of fact regarding the Products, including, but not limited to the amount of TiO2 in the products, that TiO2 is not safe for human consumption, and other material omissions related to TiO2 in the Products.

47. **WHY:** Defendant made the material omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products, the effect of which was that Defendant profited by selling the Products to hundreds of thousands of consumers.

48.     **INJURY:** Plaintiff and Class Members purchased, paid a premium (up to the full price), or otherwise paid more for the Products than they otherwise would have absent Defendant's omissions.

## CLASS ALLEGATIONS

49.     **Class Definition.** Plaintiff brings this action on behalf of a class of similarly situated individuals, defined as all persons in the United States who, within the applicable statute of limitations period, up to and including the date of final judgment in this action, purchased any of Defendant's Products at issue (the "Class").

50.     **Illinois Subclass.** Plaintiff also seeks to represent a subclass of all Class Members who within the applicable statue of limitations period, up to and including the date of final judgment in this action, purchased any of the Products at issue in Illinois (the "Illinois Subclass").

51.     Excluded from the Class and Illinois Subclass are persons who made such purchase for purpose of resale, Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the Judge to whom this action is assigned, and members of the Judge's staff, and the Judge's immediate family.

52.     Plaintiff reserves the right to amend the definition of the Class and Illinois Subclass if discovery or further investigation reveals that the Class or Illinois Subclass should be expanded or otherwise modified.

53.     **Numerosity.** Members of the Class and Illinois Subclass are so numerous that their individual joinder herein is impractical. On information and belief, members of the Class and Illinois Subclass number in the millions. The precise number of the Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class

Members may be notified of the pendency of this action by mail and/or publications through the distribution records of Defendant and third-party retailers and vendors.

54. **Commonality and Predominance.** Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include but are not limited to: whether Defendant warranted the Products as "Safe for Human Consumption"; whether the Products contain Titanium Dioxide; whether Defendant breached these warranties; and whether Defendant committed the statutory and common law violations alleged against them herein by doing so.

55. **Typicality.** The claims of the named Plaintiff are typical of the claims of the Class in that Plaintiff purchased one of Defendant's Products in reliance on the presentations and warranties described above and suffered a loss as a result of that purchase.

56. **Adequacy.** Plaintiff is an adequate representative of the Class and Illinois Subclass because his interest does not conflict with the interests of the Class and Illinois Subclass Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the Class and Illinois Subclass members will be fairly and adequately protected by Plaintiff and his counsel.

57. **Superiority.** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense of all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents

far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issue will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

58.     Defendant has acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class and Illinois Subclass as a whole.

59.     Without a class action, Defendant will continue a course of action that will result in further damages to Plaintiff and members of the Class and Illinois Subclass and will likely retain the benefits of its wrongdoing.

60.     Based on the foregoing allegations, Plaintiff's claims for relief include those set forth below.

## <u>COUNT I</u>
**Violation of Illinois's Uniform Deceptive Trade Practices Act,**
**815 ILCS 510,** *et seq.*

61.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

62.     Plaintiff brings this claim individually and on behalf of the Class and Illinois Subclass against Defendant.

63.     The Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510 provides, in part, that:

> "A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:
> (1) passes off goods or services as those of another;
> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
> (3) causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another;

14

(4) uses deceptive representations or designations of geographic origin in connection with goods or services;

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;

(6) represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;

(8) disparages the goods, services, or business of another by false or misleading representation of fact;

(9) advertises goods or services with intent not to sell them as advertised;

(10) advertises goods or services with intent not to supply reasonably expectable public demand, unless the advertisement discloses a limitation of quantity;

(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

For the reasons discussed above, Defendant has engaged in practices that violate the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510.

64.     By committing the acts and practices alleged herein, Defendant has violated Illinois's Uniform Deceptive Trade Practices Act 815 ILCS 510, as to the Class, by engaging in unlawful, fraudulent, and unfair conduct.

65.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers. In addition, Defendant has committed unlawful business practices by, inter alia, making the omissions of material facts, as set forth more fully herein, and violating the common law.

66.     Plaintiff and the Class Members reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

67. Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute unlawful business acts and practices within the meaning of the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510 *et seq.* in that its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

68. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

69. Defendant's claims, non-disclosures and misleading statements with respect to the Products, as more fully set forth above, were false, misleading and/or likely to deceive or cause confusion for the consuming public within the meaning of the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510 *et seq.*

70. Plaintiff and the Class Members suffered a substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of the Products.

71. There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Products.

72. Plaintiff and the Class Members had no way of reasonably knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled. Thus, they could not have reasonably avoided the injury each of them suffered.

73. The gravity of the consequences of Defendant's conduct as described outweighs any justification, motive, or reason therefore, particularly considering the available legal

alternatives which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the Class Members.

74.     Pursuant to the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510 *et seq.,* Plaintiff and the Class and Illinois Subclass seek an order of this Court that includes, but is not limited to, an order providing (a) injunctive relief; (b) costs of Plaintiff's and Class and Illinois Subclass Members' attorneys' fees and costs; and (c) any other further relief the Court deems reasonable and equitable.

75.     Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

76.     Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Products so that Plaintiff and Class and Illinois Subclass Members can reasonably rely on Defendant's representations as well of those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

77.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction requiring either (1) adequate disclosure of TiO2 in the Products and its effects; or (2) the removal of such chemicals from the Products packaging, will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make an

informed decision about the purchase of the Products absent omissions with the full purchase price at his disposal.

<u>**COUNT II**</u>
**Violation of Illinois's Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505, *et seq.***

78. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

79. Plaintiff brings this claim individually and on behalf of the Class and Illinois Subclass against Defendant.

80. Illinois's Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505, *et seq.* prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce….whether any person has in fact been misled, deceived or damaged thereby…"

81. Defendant violated the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505, *et seq.* by holding out the Products as safe for human consumption, when in fact the Products are not safe, are dangerous and useless.

82. The Products are not safe because they contain TiO2, a harmful toxin with known adverse health effects.

83. Defendant has exclusive or superior knowledge of the Products' composition and the associated health concerns, which was not known to Plaintiff or Class and Illinois Subclass Members.

84.     Plaintiff and Class and Illinois Subclass have suffered harm as a result of these violations of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ICLS 505, *et seq.* because they have incurred charges and/or paid monies for the Products that they otherwise would not have incurred or paid and were unknowingly exposed to a significant and substantial health risk.

85.     Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

86.     Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Products so that Plaintiff and Class and Illinois Subclass Members can reasonably rely on Defendant's representations as well of those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

87.     Restitution and/or injunction relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction requiring either (1) adequate disclosure of TiO2 in the Products and its effects; or (2) the removal of such chemicals from the Products, will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make an informed decision about the purchase of the Products absent omissions with the full purchase price at his disposal.

## COUNT III
### Additional Violation of Illinois's Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505, *et seq.*

88.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

89.     Plaintiff brings this claim individually and on behalf of Class and Illinois Subclass Members against Defendant.

90.     Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive Plaintiff, Class and Illinois Subclass Members, and the general public. As described above, and throughout this Complaint, Defendant misrepresented the Products as safe for human consumption when, in fact, the Products were not safe for human consumption.

91.     By its actions, Defendant disseminated advertising regarding the Products to and across Illinois. The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505, *et seq.* Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

92.     The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Products contain substances that pose a significant risk to the health and well-being of Plaintiff and Class and Illinois Subclass Members.

93.     Defendant continues to misrepresent to consumers that the Products are safe for consumption. However, as described herein, that is not the case.

94.     In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of Illinois law. Plaintiff and other Class and Illinois Subclass Members based their purchasing decisions on Defendant's omitted material facts. The revenue attributable to the Products sold in those false and misleading

advertisements likely amounts to tens of millions of dollars. Plaintiff and Class and Illinois Subclass Members were injured in fact and lost money and property as a result.

95. The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505, *et seq.*

96. As a result of Defendant's wrongful conduct, Plaintiff and Class and Illinois Subclass Members lost money in an amount to be proven at trial. Plaintiff and Class and Illinois Subclass Members are therefore entitled to restitution as appropriate for this cause of action.

97. Plaintiff and Class and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs; injunctive relief; and other appropriate equitable relief.

98. Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Products is determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

99. Injunctive relief is also appropriate, and indeed necessary, to require Defendant to provide full and accurate disclosures regarding the Products so that Plaintiff and Class and Illinois Subclass Members can reasonably rely on Defendant's representations as well as those of Defendant's competitors who may then have an incentive to follow Defendant's deceptive practices, further misleading consumers.

100.     Restitution and/or injunctive relief may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price, and an injunction requiring either (1) adequate disclosure of the TiO2 in the Products and its effects; or (2) the removal of such chemicals from the Products, will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make an informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at his disposal.

## COUNT IV
### Fraud

101.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

102.     Plaintiff brings this claim individually and on behalf of the Class and Illinois Subclass.

103.     At the time Plaintiff and Class and Illinois Subclass Members purchased the Products, Defendant did not disclose, but instead concealed and misrepresented, the Products as safe for human consumption.

104.     Defendant also knew that its omissions and misrepresentations regarding the Products were material, and that a reasonable consumer would rely upon Defendant's omissions in making purchasing decisions.

105.     Plaintiff and Class and Illinois Subclass Members did not know – nor could they have known through reasonable diligence – about the true nature of the Products.

106.     Plaintiff and Class and Illinois Subclass Members would have been reasonable in relying on Defendant's omissions in making their purchasing decisions.

107.    Plaintiff and Class and Illinois Subclass Members had a right to rely upon Defendant's omissions as Defendant maintained monopolistic control over knowledge of the true nature and quality of the Products.

108.    Plaintiff and Class and Illinois Subclass Members sustained damages as a result of their reliance on Defendant's omissions, thus causing Plaintiff and Class and Illinois Subclass Members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

**COUNT V**
**Fraudulent Inducement**

109.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

110.    Plaintiff brings this claim individually and on behalf of the Class and Illinois Subclass against Defendant.

111.    Defendant did not disclose, but instead concealed material information about the Products as described herein.

112.    Defendant knew, or should have known, that the Products were falsely and misleadingly portrayed and that knowledge of the safety-related issues discussed throughout this Complaint were withheld from the consumer public.

113.    Defendant also knew that its omissions regarding the Products were material, and that a reasonable consumer would rely on Defendant's omissions in making purchasing decisions.

114.    Plaintiff and Class and Illinois Subclass Members did not know – nor could they have known through reasonable diligence – about the true nature and quality of the Products.

115.    Plaintiff and Class and Illinois Subclass Members would have been reasonable in relying on Defendant's omissions in making their purchasing decisions.

116.    Plaintiff and Class and Illinois Subclass Members had a right to rely on Defendant's omissions as Defendant maintained monopolistic/superior control over the Products, and what information was available regarding the Products.

117.    Defendant intended to induce – and did, indeed, induce – Plaintiff and Class and Illinois Subclass Members into purchasing the Products based upon its omissions.

118.    Plaintiff and Class and Illinois Subclass Members sustained damages as a result of their reliance on Defendant's omission, thus causing Plaintiff and Class and Illinois Subclass Members to sustain actual losses and damages in a sum to be determined at trial.

<u>**COUNT VI**</u>
**Fraudulent Concealment or Omission**

119.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

120.    Plaintiff brings this claim individually and on behalf of the Class and Illinois Subclass against Defendant.

121.    At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Products.

122.    Defendant, acting through its representatives or agents, delivered the Products to its distributors and various other distribution channels.

123.    Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Products as discussed throughout.

124.    Rather than inform consumers of the truth regarding the Products, Defendant misrepresented the quality of the Products as discussed herein at the time of purchase.

125.    Defendant made these material misrepresentations to boost or maintain sales of the Products, and to falsely assure purchasers of the Products that Defendant is a reputable company

and that its Products are safe for consumption. The false representations were material to consumers because the omissions played a significant role in the value of the Products purchased.

126.     Plaintiff and Class and Illinois Subclass Members accepted the terms of use, which were silent on the true nature of the Products, as discussed throughout this Complaint. Plaintiff and Class and Illinois Subclass Members had no way of knowing Defendant's omissions as to the Products and had no way of knowing that Defendant's omissions were misleading.

127.     Although Defendant had a duty to ensure the safety, completeness, and accuracy of the information regarding the Products, it did not fulfill these duties.

128.     Defendant omitted or concealed material facts partly to pad and protect its profits, as it saw that profits and sales of the Products were essential for its continued growth and to maintain and grow its reputation as a premier designer and vendor of the Products. Such benefits came at the expense of Plaintiff and Class and Illinois Subclass Members.

129.     Plaintiff and Class and Illinois Subclass Members were unaware of these material omissions, and they would not have acted as they did had they known the truth. Plaintiff's and Class and Illinois Subclass Members' actions were justified given Defendant's omissions. Defendant was in the exclusive/superior control of material facts, and such facts were not widely know to the public.

130.     Due to Defendant's misrepresentations, Plaintiff and Class and Illinois Subclass Members sustained injury due to the purchase of the Products that did not live up to its advertised representations. Plaintiff and Class and Illinois Subclass Members are entitled to recover full refunds for the Products they purchased due to Defendant's omissions.

131.     Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff's and Class and Illinois Subclass Members' rights

and well-being, and in part to enrich itself at the expense of consumers. Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

**COUNT VII**
**Quasi-Contract/Unjust Enrichment**

132.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

133.    Plaintiff brings this claim individually and on behalf of the Class and Illinois Subclass against Defendant.

134.    To the extent required by law, this cause of action is alleged in the alternative to legal claims.

135.    Plaintiff and Class and Illinois Subclass Members conferred benefits on Defendant by purchasing the Products.

136.    Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and Class and Illinois Subclass Members' purchases of the Products. Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Products were unfit for its intended purpose as it was unsafe for use. These omissions caused injuries to Plaintiff and Class and Illinois Subclass Members because they would not have purchased the Products if the true facts were known.

137.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class and Illinois Subclass Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

138.    Here, equitable relief is appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from his purchase of the Products is determined to be an

amount less than the premium price of the Products. Without compensation for the full premium price of the Products, Plaintiff would be left without the parity in purchasing power to which he is entitled.

139.    Restitution may also be more certain, prompt, and efficient than other legal remedies requested herein. The return of the full premium price will ensure that Plaintiff is in the same place he would have been in had Defendant's wrongful conduct not occurred, i.e., the position to make an informed decision about the purchase of the Products absent omissions and misrepresentations with the full purchase price at his disposal.

## COUNT VIII

**Breaches of Express Warranty, Implied Warranty of Merchantability/Fitness for a Particular Purpose, and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.**

140.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

141.    Plaintiff brings this claim individually and on behalf of the Class and Illinois Subclass against Defendant.

142.    To the extent required by law, this cause of action is alleged in the alternative to legal claims.

143.    The Product was manufactured, identified, packaged, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it was safe for human consumption.

144.    Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, targeted digital advertising, and through public statements, including a statement wherein it promised to phase-out and remove TiO2 from the Product.

145.    Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

146.    Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the Product was safe for human consumption and did not contain ingredients widely known to have significant health repercussions.

147.    Defendant's representations affirmed and promised that the Product was safe for human consumption and did not contain ingredients widely known to have significant health repercussions.

148.    Defendant described the Product as one that was safe for human consumption and free from ingredients widely known to have significant health repercussions, which became part of the basis of the bargain that the Product would conform to its affirmations and promises.

149.    Defendant had a duty to disclose and/or provide non-deceptive descriptions ad marketing of the product.

150.    This duty is based on defendant's outsized role in the market for this type of Product, one of the most recognizable candies/confectionary companies in the nation.

151.    Plaintiff recently became aware of Defendant's breach of the Product's warranties.

152.    Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

153.    Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

154.     Defendant received notice and should have been aware of these issues due to complaints by third-parties, the banning of TiO2 in its Product in other nations, regulators, competitors, consumers, and in online forums.

155.     The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

156.     The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which the Product was bought by Plaintiff, because he expected it to be safe for human consumption and not contain ingredients widely known to have significant health repercussions.

157.     The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it was safe for human consumption and free from ingredients widely known to have significant health repercussions, and he relied on Defendant's skill and judgment to select or furnish such a suitable Product.

158.     Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks Judgment against Defendant as follows:

a)  Finding that this action satisfies the requirements for maintenance as a class action as set forth in 735 ILCS 5/2-801, et seq. and certifying the class defined herein;

b)  Appointing Plaintiff as representative of the Class and the undersigned counsel as class counsel;

c)   An order declaring that Defendant's conduct violates the statutes referenced herein;

d)   Entering judgment in favor of Plaintiff and the Class against Defendant on all counts asserted herein;

e)   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

f)   For prejudgment interest on all amounts awarded;

g)   For an order of restitution and all other forms of equitable monetary relief;

h)   For injunctive relief as pleaded or as the Court may deem proper;

i)   For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

Respectfully submitted,

Dated: August 11, 2022

By: <u>Bret K. Pufahl, Esq.</u>

Bret K. Pufahl, Esq. (6325814)
Elizabeth C. Chavez, Esq. (6323726)
Kathleen C. Chavez, Esq. (6255735)
Peter L. Currie, Esq. (6281711)
FOOTE, MIELKE, CHAVEZ & O'NEIL, LLC
10 West State Street, Suite 200
Geneva, Illinois 60134
Tel. No.: (630) 232-7450
Fax No.: (630) 232-7452
Email: bkp@fmcolaw.com
        ecc@fmcolaw.com
        kcc@fmcolaw.com
        plc@fmcolaw.com